Case No. 16-5080, National Mall Tours of Washington, Inc. Appellant v. United States Department of the Interior et al. Mr. Garden for the Appellant, Mr. Field for Appley, U.S. Department of the Interior, Mr. Swain for Appley City Sightseeing, Washington, D.C. Good morning, Your Honors. Good morning. I'm Kevin Garden, Counsel for Appellant, National Mall Tours of Washington, Inc., and I have reserved three minutes of my time for rebuttal. Your Honors, the District Court below erred in two key regards. First, the District Court improperly found that the term controlling interest did not apply beyond the parent level of a company that was bidding on a federal concession contract. And this finding was contrary to the plain language of the applicable regulatory definition. Wasn't she following the pretty strong dicta of this Court in a manual plan? Yes, Your Honor. Actually, we do not believe so. The dicta in that Court, first of all, was addressing 51.85, which dealt with when it's appropriate to obtain approval of that. And when you read that decision— You mean in terms of an existing concessionary? Yes, and when there's a need to approve a change. But when you look at this case, Your Honor, this case specifically involved the term controlling interest. What does it mean? What does it include? And the AmFact resource case never dealt with that. But we think when you look at the plain language of that definition, which clearly— Are you suggesting in this case there isn't a requirement of approval? You just distinguished it on the grounds that the first—in the AmFact case, there's a requirement of approval. But you're saying in this case there is no requirement of approval. No, that would not apply, Your Honor. I didn't think you were going to say that. Correct. No, that would not apply here. What we have here is a situation where a prospectus calls for certain specific information, and there's a definition that applies to some of that information. That information was not in—was known to be no longer valid at the time the award decision was made. So the regulation at AmFact really does not apply here because we're not in that situation. The term certainly does controlling interest, and that's defined in 51.84. The problem with your argument, I see, is that 51.84 is part of—I think it's subpart J, and it says that these definitions apply to this part, meaning to subpart J. There's a definition of concessioner that's in 51.3, and that definition replies to this part, meaning the entirety of part 51. So it seems to me that you are trying to use a definition that applies to subpart J, which only talks about transfers of contracts, which we don't have here, and saying that that definition should override the general definition of concessioner that applies to the entirety of part 51, and that would apply specifically to the procurement of a contract. Actually, Your Honor, that's not what we're doing because we're—as I understand it, the term concessioner is not really applicable here. The term that's at issue here is the term controlling interest. That's specifically used in the regulation. I understand, Your Honor— But that's used in a regulation that isn't applicable to these circumstances. Correct, but it's also used in the prospectus. The prospectus clearly calls for all potential park service concessioners that are bidding on this contract to provide certain information about their controlling interest. Now, the only definition that's in play here that's been offered by any party is the definition in 51.84. Yes, it is in a different subsection, but I think to look at the prospectus where it specifically says to potential concessioners, provide us information about your controlling interest and then not conclude that definition applies doesn't make sense in that there's no other definition. And even the district court recognized that. If nothing else, there's an analogy there. Assuming, arguendo, that you're right, that the only definition of controlling interest is the one in the different section, and therefore it must be used, in your view, by analogy, why is the change that came about and which was disclosed to the agency, why is that of particular significance? It's of significance, Your Honor, because it changed the fundamental basis for the award decision, which had not been made yet before that change came to light. So therefore, you have a problem where you know that... So the whole question is whether it was a material change, right? Correct, and we believe it was very material. And the regulation says information required by the prospectus refers to information that is required by the prospectus and that is material as determined by the service. So it's up to the service to determine whether it's material or not, right? It would be in that regard, except that you've got specifically calling for controlling interest. Yes, Your Honor, you've got the situation where you have that judgment being made by the agency, but they can abuse their discretion in that regard because if you look at their own regulations, it's such... So your whole argument in this case depends on the proposition that the decision made by the agency that this was not material, the change was not material, is arbitrary and capricious. That's your whole case. And abuse of discretion, yes, Your Honor. Well, you don't need to abuse it. If it's arbitrary and capricious, you don't need to abuse it. It's just discretion, I'm done. But if you... Remember it says as determined by the service. You know, that's a lot of discretion on that. Understood that, Your Honor. But we also know that the service determined in the regulations that controlling interest, knowing all about it, was very important to them. In fact, they stated that a change in the controlling interest if not approved is a material breach. And they gave specific reasons for why it's important. No, that's only on the concessionary question, right? Yes, but it's the same term, Your Honor, so it demonstrates... Well, it would mean that it was material, Your Honor, and that it doesn't make sense. If this information about this term is necessary, if you don't have enough information, there's a change in it that way. It would constitute a material breach automatically, a material breach of this contract. It doesn't make any logical sense to then say that, but when we're reviewing you to decide whether or not you should have this contract, we don't care if this changes. You can't have it both ways. Well, of course, in the AmFact case, we focused primarily, and Dick did, to be sure, we focused primarily on the management of the direct corporation that's running the concession rather than the parent. I admit that this grandparent argument is a little thin since there's only a paper company between the corporation and the grandparent. But so what? We have said the real focus is on the management of the operation. So why are they arbitrary and capricious in thinking that, even in the case of a concessionaire? Because it shows that the regulation, the definition, shows that the focus of the agency is on the bottom line. Who has the ability to control these operations? They want to know about that person. And we think it's very clear that when Exponent acquired 60% of Limited, which then wholly owns the concessionaire, clearly Exponent now has that ability. But see, your problem is to go back to AmFacts. In this particular case, even if you're right about the regulation, your problem is that the agency was just following what we said in AmFacts, namely that it just wasn't workable to go beyond the level of the parent because of the possibility that a grandparent could just be purchased on the stock market. Right? Right. So how could it conceivably be unreasonable for an agency to adopt an interpretation that's based on dicta from this court? Well, two things, Your Honor. First of all, with all respect, of course, we don't think that those dicta comments were valid because we don't think the state— That's not my point. You're missing the point. Given that they're there. They're there, and the agency—I mean, I get your point. In fact, my question was based on the assumption that you're right about the better interpretation of the regulation. But just put yourself in the position of the agency. Okay? The D.C. Circuit issues an opinion with some pretty clear dicta in here, including a hypothetical, and it explains exactly why going beyond the parent doesn't make any sense. And so that's what the agency does. Right? So how can we, you know, years later come along and say— Because our question really is have they reasonably interpreted their regulation? And they've done it directly as a result of what we've said. So how can that be unreasonable? Well, Your Honor, we think that's unreasonable because, first of all, notably the agency never even referred to AMFAC in their filings below. So they weren't going on AMFAC because they never even referred to it. So they weren't even looking at that case decision to guide their decision. You mean the District Court? Sorry? But they cite it here. They do here because the court below cited it. But when the agency was explaining their position, they never cited AMFAC as the basis for their position. So what? I don't understand. Why not? They were defending their regulation in the District Court. Right. Defending it here. They can make new arguments here. They can. Those aren't waived. Yes, Your Honor. But the AMFAC decision was focused on a different election. I got you. I got you. But the core of the AMFAC decision is it doesn't make any sense to go beyond the parent. And so that's what the agency's done. And for us to say now the agency was unreasonable in taking that position, right, we're saying the AMFAC's decision was unreasonable. Yes, Your Honor. I think you would have to be saying that. What do we do about that? I've never seen anything like that. But, Your Honor, I don't believe that the agency should have got their decision. The reason of their decision should be judged on the validity of the statements in a court's opinion. Let me ask you a different question. You were talking to Judge Silverman about Big Bus's submission after you notified the agency of the purchase of the controlling interest in the grandparent. So what do you think? And I gather your view is that the agency's request to Big Bus was not proper, right? Yes. There was no ambiguity in the original proposal, right? Yes. Okay. So what's an agency to do in a situation like this? Follow the rules. I'm sorry. Let me make a jump. Okay. The rules say that a clarification has to be limited to a situation where there's an ambiguity, right? Yes. Okay. Or they have to ask for an amendment and give everybody else an opportunity, right? When certain circumstances exist, yes. So what's an agency to do when a situation like this happens, where it learns, again, through you, that circumstances have changed since the original bid, but the circumstances only related to the bidder, nobody else. The only question is whether one bidder had a change in ownership. You say it can't ask for supplementary information, right? Correct. And it can't – what can it do? You wrote the letter. What did you expect the agency to do? We expected the agency to recognize that that offer from Big Bus Tourist, who was well aware of these rules when they participated in this competition, that they recognized their bid was no longer valid because it wasn't accurate. You can't award them. But the bid was accurate, and you agree with that. At the time of the war, Your Honor. Right. And they knew before they made the award, which is the final decision. So it's your position that once circumstances change in a material way for a bidder, they're done, they're cooked. Stick a fork in them. Only with regard to the Park Service's very specifically designed regulations. Yes, Your Honor. They wrote the regulations, and if you apply the rules, which you all have to live by, that's the outcome. And that's a reasonable interpretation and a reasonable procurement scheme. There's no other way out, given their own regulations. Why is there no other way out? They could actually do re-bidding. Well, they could. I'm sorry, Your Honor. On the remand, of course, they could always cancel. So, you know, I wondered why you're litigating. Because the final alternative argument is even if you were right, all you would get is a remand and exactly the same results. We don't know that, Your Honor. We don't know that, Your Honor, because the original bid didn't say anything about exponent. Exponent is only known to anybody by name. We know nothing about exponent. Can you tell us what should have caused the Park Service to change their decision after learning of exponent? Recognizing that there was a material change in the accuracy of Big Bus Tour's bid with regard to their controlling interest, which is a material element that the Park Service is controlling. You're saying that if there's a material change, that automatically means that there's prejudice. You know, I read your brief and your reply brief, and in each of them you only used the term prejudice or prejudicial once. There's no explanation in either of those briefs as to how this material change was prejudicial to you.  Your Honor, because the process assumes a fair and legal adherence to the process, to the competition process. So when you have a situation where your fellow bidder puts in a bid and then you hold tight, you don't change your corporate structure, you may pass up on opportunities, you don't. But your fellow bidder takes advantage of a new acquisition and changes their controlling interest. They've now got an advantage because they have a flexibility that you didn't have. Had you known that, maybe you would have treated your bid differently. But you can't allow bidders to simply change their position after their bids go in because that doesn't make it fair. The rules as written recognize you can't. Only if it's a material change. Only if it's a material change. Everything depends on the proposition that it's a material change. It does, Your Honor. In Section 51.8. If you follow the logic of Judge Randolph in AmFact, there really is no significance when there is a change, allegedly a change in control of a parent of a company that is operating. Unless there's some focus on the change in the management of the direct concessionaire or prospective concessionaire. Now, is that unreasonable? That's not. And we think the record in this case, given what we know about exponent and what they stated about the acquisition, shows they did intend, even though the regulation only requires the ability to control, which they have. They went above and beyond that and demonstrated that. Their whole purpose of acquiring Big Bus Limited was to get in there and change up the management. No, their purpose in acquiring all kinds of companies is to enhance efficiency. But you, there is a, here's the key, it seems to me. There is now, under the agency's interpretation, if exponent were to use its controlling interest, controlling in your theory, to change the management of Big Bus, then the balloon goes off as a concessionaire, right? Then the agency has a right to say, oh, no dice, you can't do that. It certainly applies in that situation, but it also applies given the definition. That's the only thing that's relevant. No, it also applies if you look at the regulation and when they have the ability to do that. The Park Service has made it clear. They want to know, not just who's going to, but who can make that change. And Section 51.87. Not if they follow, not if they follow Ampact. Correct, Your Honor. Ampact's logic is unless there is a change in the management, there's no significance. And Ampact, as we mentioned, that was also. I know it's difficult, but why is it unreasonable? And that goes back to Judge Taylor's point. How can you say it's unreasonable? I don't know why it's unreasonable even if they didn't follow it, but they did follow it. So why is it unreasonable to take the position, hey, we're not going to worry unless there is a change in the management structure, change in the behavior, change in the operations? Because we believe that the agencies, the reasonableness of the agency's decision should not be based on dicta and a vacated decision that we think is clearly. You're not answering why that is unreasonable. You don't get anywhere with the vacated. The vacated has nothing to do with this issue. That doesn't help you. Go ahead. Sorry. You still haven't answered why that's unreasonable. So the question to me is if we accept the dicta as valid or binding on the agency. Do you understand my question? If the agency takes their position, whether we're talking about a bidder or even a concessionaire, that we're not worried unless a change in the corporate structure above it results in a change in the management or operations of the direct concessionaire. Why is that unreasonable? Because that's contrary to their own regulations. It's not unreasonable, then? No, it is unreasonable because they're contrary. No, no, I mean, put aside. If they come up with that interpretation, you can't say that that's an unreasonable interpretation. No, if that had been the interpretation all along in the regulations and that was the rules of the game for everybody to follow, of course that would be reasonable if they put it out through a regular process. No, that gets back when you say the rules of the game for everybody to follow. That gets back to my colleague's question. Why in the Lord's name are you prejudiced? We've been prejudiced because... You could have sold your company to somebody, to Tatelink, and gotten $50 million or something like that? No, Your Honor, I don't believe we could because the regulations specifically say controlling interest applies to... Well, I'm asking why are you prejudiced? Because you didn't have an opportunity to sell your company. Right, we were playing by a different set of rules. Is that why you're prejudiced? Yes, Your Honor. You couldn't sell your company? Well, yes, Your Honor, because we didn't have the same flexibility as Big Bus did, yes. Okay. On the congressional review issue, why do you have standing to raise that? We believe, Your Honor... The most that that statute gets you is that the Park Service was supposed to send a copy of the contract to two congressional committees,  but it doesn't say that those committees can veto the contract and the committee can't do that. It doesn't even say that the committees get the proposals so that they can see whether the Park Service awarded this to the best bidder because they can compare proposals. They just get the contract, the proposed contract of the winner. So how is there any injury or redressability for you if that process had been fulfilled? Because, Your Honor, that process is a part, a pre-award part of the process, and we are entitled to that congressional review to the extent that Congress decides within their powers they want to do something about that award. Clearly, Congress intended to have that ability because they wouldn't have required that notification and review before award. So I think that we have no standing. Is there anything on the record showing that there's ever been an instance where Congress has been given a contract, pursuant to that provision, and they've done something to prevent that contract from going forward? Nothing or whatever, Your Honor. But I think to hold that we have no standing is tantamount to holding that that entire process is meaningless and would never result in anything. The information that comes to Congress is just the amount of the money that's involved in this, in the bidder. There's nothing comparing, as Judge Wilken points out, nothing comparing any alternatives. No, I don't want to – Doesn't that suggest strongly that Congress's only concern is we want to see how much money is going out to bid? That's all. No, Your Honor, because I think if that were true, they would just want notification of the award and the amount. They want the contract. They want to see what that – But they don't want – but they're asking to look at other bidders. Not yet, but they certainly have that right. It's Congress. Wait a minute. Wait a minute. But the structure doesn't ask to look – That's Judge Wilken's point. It doesn't look – Correct. Congress is not interested in the competition. I know you say it comes out of a general legislation which includes concern for competition, but I don't see how this provision has anything to do with competition. Well, Your Honor, because it's a career award, we think that shows it is part of the competition. The Congressional – Why? Congress didn't ask for the other bidders. Because they have the right to do that once they see the contract. No, they always have the right to do that. Now, let me ask you a question. Suppose that Congress had – suppose the legislation had provided that the bids must be disclosed in the Federal Register. I mean, the final bid should be disclosed in the Federal Register, and the agency hadn't done that. Would that give you standing? Would you have an injury then? If it was required to be disclosed. It very well may, yes, Your Honor. Well, yes or no? Yes. What about legislation that requires it be sent to the newspapers? The final award goes to the newspapers. That very well could, Your Honor. Why isn't – are you done with that? Why isn't your – the government says your notification argument is waived. With regard to the $5 million? Yes. Yes, because, Your Honor, it wasn't waived because their point is that my client estimated that the – No, no, no. They say it's waived because you knew about this. It's in your complaint. In other words – Yes, that's what I'm getting at. It wasn't dependent. When you filed your complaint, you knew about it, so, therefore, you had an earlier opportunity to raise this question. And you have to raise it at the earliest possible date, and you didn't. Yes. Well, what we came aware of and the basis for our position now when we got the record was that the agency had two inconsistent estimates. No, that's not my point. I understand that. But when you filed your complaint, you must have thought that the bid exceeded $5 million, right? Yes, Your Honor. Okay. That's their point. Their point is you had all the information. The only information you needed to challenge this at an earlier date was that it exceeded $5 million. And you must have known that because you put it in your complaint. Yeah, Your Honor, I don't believe that's the only information we needed because – Why? What else would you need? That's what the statute says, anything in excess of $5 million. If it was under $5 million, you couldn't have raised this question. If it's over $5 million, you could have. You didn't. It's not exactly – It's waived. The statute says more. It says what the agency estimates it to be. So the problem you've got is that you can disagree with an agency estimate. My only point is you put it in your complaint, so you must have known that there was a problem. We did suspect there was a problem, Your Honor, but we didn't have the concrete information we have now. I mean, you can't put stuff in your complaint that you don't have a reasonable basis for thinking is accurate anyway. We had a reasonable basis for everything. Yes, Your Honor. Okay. And so the government says it's waived, and you haven't told me why it isn't. Other than that, well, you didn't discover this discrepancy until later. Your Honor, even if that allegation based on what we knew at the time had been waived, a new allegation can be brought once we get the administrative record based on new information that comes into our hands. So the information we got – we could have amended the complaint later on once we obtained the administrative record. We already had it in there. I don't see how that could – we're disqualified from raising that on that basis based on new information that we were never told about before we got the administrative record. Anything else? No. Okay. Thank you. Thank you, Your Honor. From the government. Good morning, Your Honors. Brian Field on behalf of the Federal Appellate. In this case, it's an APA challenge to the agency award of a concession contract, and in such cases this court employs a highly deferential application of its arbitrary and capricious standard where it will only set aside the agency action if the complaining party has carried its heavy burden of showing that the agency's action failed to afford with the applicable statutes and regulations and lack of rational basis. Well, isn't – haven't they met that heavy burden by showing that the agency's interpretation of this regulation, an interest beneficial – this definition – interest beneficial or otherwise sufficient outstanding voting securities or capital of the concessioner or related entities that permits it. The agency's interpretation ignores the phrase or related entities. Doesn't it? Respectfully, Your Honor, I would disagree. I thought you might. Why? We would disagree with that because I don't think – By the way, would you agree that if it does, they've met their standard? As deferential as it is, that meets the standard if they're right about that. Right? If they can show that – Yeah. I mean, if the agency, in fact, ignored these three words. If the agency entirely ignored these three words, then – Okay. So explain to me why it doesn't.  So I think that this ties into the AMFAC conversation that the Court was having with Allen. Why don't you just start with those words? Of course, Your Honor. Let's put AMFACs aside for a minute. Sure. I understand your AMFACs argument, but let's start with the right. So the regulatory text – It says or related entities. Yes, Your Honor. You're talking about the regulation dealing with the prospectus, right? Yeah. I'm talking about – Not the other regulation that deals with the concessionaire. No. No. I'm talking about – right. Right. Your Honor, we – In a concessionaire. In a concessionaire. Correct. So we – the Park Service's position is that the related entity analysis does, in fact, include – I mean, not – The Park Service is not advancing a position here today where we're trying to read – where we would be attempting to read out the related entity language from any regulatory scheme. What we are saying is that the related entity analysis includes a view of whether or not that related entity has an ability to exercise managerial authority over the – Now, here's where I am really puzzled by your position, because let's forget the paper corporation in the middle, the parent, you call it, and let's go right to the real ownership. Now, are you seriously suggesting that if this exponent takes 60 percent of the stock, it has no capacity to control Big Bus? The position we are taking is that it is not clear that exponent necessarily has the ability to – Yeah, you said in the brief that it doesn't necessarily exercise control, but that's not really the relevant question. The question, I thought, was whether they have the capacity to control under your regulations. Yeah, that's correct, Your Honor, and it's the first – So you – In fact, it says permits the exercise. That's – Yeah.  Permits the exercise. Thank you. You're welcome. Yes, Your Honor, and I – just because – I guess standing here today, it is conceivable that we could say that exponent, by function of acquiring a 60 percent interest in Big Bus Tours Limited, has the ability to exercise managerial authority. But it's equally true that it may not, and we don't know what the corporate structure is within – What do you mean, the capacity is not a may not? If you've got 60 percent, it's clear you have capacity. I don't know – You don't have circumstances where you have 60 percent of a corporation and you don't have capacity. Well, I think that there are – I guess – Whether they're going to do it or not is another question. Incidentally, suppose in this case information came to you that exponent was a mafia organization. Is it your position that you have no ability to look behind the Big Bus as a concessionaire to look at the mafia parent? No, Your Honor. I think that the – I think that if information were presented to the Park Service that an offeror or an existing concessionaire was in some type of corporate relationship with an entity that was owned by the mafia – In a type – what do you mean, in some type of corporate relationship? Owned by a mafia corporation. Well, I think – I think for the purpose of your question, Your Honor, I guess I was expanding a little bit more to say that if it came – Even if it had 5 percent, it would be worth it. If the Park Service was informed that an entity that had a 5 percent ownership in a company was owned by the mafia, I think it would be the Park Service's position that it would be entirely reasonable for the Park Service to inquire and review that information. I don't – On the grounds that it's controlling? No, on the grounds that the – that the Park Service is – that the Park Service has – What is the Park Service authority if it's not based on the notion that that's a controlling relationship? Well, I think, though, at any point if an entity is not performing under its contract – That's not a separate – the mafia's not – the mafia's very careful now. We're not going to use our efforts or our control to influence big busts. We're just – this is just a laundering operation. Laundering operation. Of course, Your Honor. The Justice Department, on the other hand, which you represent, is a little troubled. Your Honor, I – in the hypothetical of a 5 percent ownership of a company that's a concessioner or that entity that has a 5 – No, we're talking about a proposal, not – either a concessioner or somebody who has a prospectus is responding to a prospectus. Sure, Your Honor. The – I would say that not as a function, obviously, of the controlling interest because if we're putting aside the 60 percent for a 5 percent, even after the evaluation panel completes its review, the director, or actually the regional director, is obligated to or is able to terminate a contract if it determines that it's not in the public interest. And I think that that is the type of information that the regional director could say. So then the question is, do you do an adequate search of or inquiry into exponent? There's nothing in the record to suggest that the Park Service necessarily looked into the specific – What's this word, necessarily, that you keep throwing up? That doesn't – that's not helpful. There's nothing in the record that shows the Park Service inquired into the other business operations of exponent. That is correct. Let's suppose Judge Silverman stole my thunder, which he always seems to do. Were you going to also ask about the mafia? My hypothetical was that exponent was actually controlled by John Smith, who's a tycoon, who's on the terrorist watch list and the no-fly list. That's fair, too. Because he funds al-Qaeda and ISIS. You see, the distinction between the two of us is I'm much older, so I think about the mafia. And so that's who exponent is. And National Mall Tours brings to your attention that exponent is purchasing Big Bus Tours Limited, and this is who exponent is. So that wouldn't be material? I think that if the letter that you're referencing that the Park Service received includes that information, that that would, in fact, be part of the – that would, in fact, be something that the Park Service would consider in its evaluation. Would it be material? Under the circumstances that you suggest, Your Honor, yes. I think it would be material to know that the investor in Big Bus Tours Limited is on the terrorist watch list. So the key to your case is that you had no information that exponent was a bad character, and therefore you had no responsibility to inquire into exponent. I think that's part of – I think part of our case is that, Your Honor. But I think the other part of our case also is that we – that the Park Service did not believe that the investment by exponent was material with respect to the operations management or finances, which is also part of its analysis. So if the letter said – if you were told that exponent is really John Smith, terrorist funder, no-fly list person, and you did the exact same thing, send us – you know, we want some updated information, and exponent sends a letter back saying, nothing to see here. We're not going to change the management of anything, so there's no reason for you to have any concerns. And the organizational structure is essentially the same. Same case. No, Your Honor, and that's because there are several assumptions in that hypothetical that I think are worth noting. And part of – at the outset, the letter from – the letter that the Park Service received expressly in your hypothetical noted the investment by this member of al-Qaeda or ISIS, whichever entity it was, and then indicated that then the Park Service asked Big Bus Tours, does this change anything about your finances and operations? And I don't think that that's how it would have played out. Instead, I think that had the letter from appellant mentioned ISIS or al-Qaeda, the Park Service probably would have asked about the finances and operations like they did, but probably would have also asked about, is this in fact true, and may in fact have also coordinated with other departments like the Department of Justice about looking into whether or not this individual is in fact on a terrorist watch list. And that would have then gone certainly into the public interest analysis under which the director or regional director is able to not enter into a contract. So I do – I think that there would be, at every step of the process, a different outcome. And I think that that information, the information that was then obtained, would absolutely be material to the agency's analysis of whether or not the government is going to enter into a contract with a company that is – whose corporate grandparent has an investor who is a member or at least – So how can it be that it's material if the grandparent is controlled by an entity sometimes, but other times it's not material? Well, I think that, going back to what I was saying very early in our conversation, I don't think that the Park Service's position is not to read out the related entity language altogether. It is certainly possible, and indeed the Park Service suggested in its briefing to the court below, that there are circumstances beyond just the concessioner or the entity submitting a proposal where an investment above that entity in the corporate chain will in fact trigger, if it were a concessioner, the change of control analysis. But again, we put a focus on the change in managerial authority, which here we were – the record shows there was no change in managerial authority, so the agency decided that that is not a material change in the offer, such that if there is some per se rule that appellant would suggest, that automatically the Park Service is barred from entering into that contract. When I first asked you about the meaning of the phrase related entities, you started to talk about AmFac, and I said I didn't want to, but now I do. So what role does that decision play in your thinking, and how should it affect the way we think about this case? AmFac, Your Honor? Yeah. Yes, Your Honor. I think that as the court was mentioning to appellant, I think that it is – I think all sides agree, and the court's already acknowledged, that the language at issue in AmFac is dicta. Right. We understand that. But I don't think – I think we would be in here with a very different argument if the agency had said, or any other agency had said, you know, the D.C. Circuit had this language in dicta about our regulations, but we think otherwise. No, no, no, but you don't. You're following it. So I'm asking you, when we look at this, what role does that play in our thinking about this case? Does that resolve the case? In other words, does AmFac – does the fact that the agency's position is consistent with that dicta, does that end it? In other words, as we said to your opponent here, how could it possibly be unreasonable for an agency to adopt a position contained in our own court's dicta? Yes, Your Honor. I do not think that – I don't think that the language is binding such that you're being presented with a question of whether or not you would have to overturn that. I think that it goes to exactly the reasonableness of the question. I do not recognize that you're getting a friendly question. And I do understand that, Your Honor, and I guess what I'm saying is that, yes, it informs the reasonability analysis. It informs the reasonability analysis. But how does it if one of the things that the court said in AmFac was that the agency had failed to parse the regulations language? In other words, it was sort of saying, you know, we're going this way just because the agency hasn't really explained itself. Your Honor, I think – So why would that be – why would that affect how we think? I mean, you know, the agency – did you see my point? In other words, it's even less significant than dicta because the agency is simply saying, well, look, the agency didn't – I mean, the court is simply saying the agency didn't really explain itself. It's a pretty weak basis for – so, I mean, it works like this. Agency service comes before this court in AmFac. It loses on the grounds that it didn't parse the language. And so it now adopts that interpretation without parsing the language. Why would we – why would we consider that at all even relevant to how we think about this? Your Honor, I think we would – the court would still find it to be relevant because it – even though it is – it is certainly correct that their 5185 could have received more attention during the AmFac briefing. And, you know, in AmFac, obviously, we're looking at all sorts of other provisions, and each – each provision received its own set of discussions with the court. But in – in 5185, there was still the court's language that we've talked about today where it is limiting the reach of 5185. And I think that that does inform the court's review or view of whether or not the agency was – I mean, that wasn't even the issue in the case. I mean, it wasn't – they didn't even talk about the phrase related entity. The case was about the distinction between a concessionaire's contract and the – a concessionaire's corporate owner. It wasn't about this grandparent issue at all. That's right, Your Honor. So, I mean, the case just seems – it's hard for me to get my mind around how a case which doesn't deal with the issue, doesn't relate to the language in the regulation that concerns us, is – is even in the context of that case dicta and rests on the proposition in part that the agency didn't explain itself. How that language could play any role in our thinking today. Yeah. I would – I would submit, Your Honor, that it can be one of the – one of the pieces of information that this court considers when judging whether or not the court acted and interprets its regulations reasonably.  Should we pay any attention to the fact that that was a review of the regulation and now we are faced with an informal adjudication? No, Your Honor, because we are – Well, we don't – no. Again, this may be more friendly than not. An informal adjudication of an agency doesn't normally have the same explanation that either a formal adjudication or a rulemaking does. And we have – you are aware of that, of course. Of course, Your Honor. So one of your arguments, of course, has got to be that this was simply an informal adjudication in which you're not expecting an opinion by Oliver Wendell Holmes. That is correct, Your Honor. I – I think that, as I was saying, that the MFAC decision is – is one piece of information that this court can take into consideration when judging whether or not the agency's decision to issue the contract to Big Bus Tours was reasonable. And part of that, based on the way that Appellant has framed this, is an analysis of whether these other regulations are, in fact, relevant and whether or not they come into play and whether or not the Park Service's interpretations of those regulations is reasonable. Here's a not-so-friendly question. Yes, Your Honor. Maybe one way of looking at MFAC is that MFAC was looking at a statute and a regulatory provision that was a prohibition on a transfer of an ownership interest of a company unless you get advance approval from the government. That's something that's very, very intrusive. And the court, therefore, said we're going to limit the reach of this regulation, especially since the statute only speaks to transfer of an interest in the actual concession contract. So a regulation that goes further and requires some sort of advance approval of the transfer of ownership in the concessioner should be limited in scope. But that's not what the context of how this definition of controlling interest is being used here. It's being used in a completely different context, which is, hey, when you submit a proposal, we want to know who the hell we're dealing with. And so give us all the information about your parents, grandparents, and who controls them so that we know who we're dealing with. And there are two different contexts, apples and oranges. And perhaps the MFAC interpretation makes sense for the transfer where there's got to be preapproval by the Department of Interior, but it doesn't make sense in the bidding context. I think there's two things, Your Honor. Well, I think taking that last point, I think that although the approval aspect of 5185 is certainly more onerous or more, like I recall the word that you used, but I think that what appellant is asking the court to do here is equally significant, which is to say that because of this interpretation of 15185, the appellant is suggesting that similar to the corporation who's going to have to seek Park Service approval for a transfer, here's an entity that has submitted a proposal that now is barred from receiving that contract. And so I don't know that there's really a particular distinction. You have to buy the appellant's argument that, you know, nothing can be amended, and once there's a change, they're out of it. We could say, you know, the Park Service is allowed to seek a clarification of ownership, but that, you know, it is material when there's a change in who is the controlling interest of the grandparent. And we would, I mean, the Park Service, you know, as the record shows, wholly adopts the proposition that it is in fact reasonable to seek that clarification, and it was ultimately concluded based on the information that it received that there was no material change. And I think that we don't have to place, I don't believe, that the Park Service needs to place too much weight on AMFAC, that we need to say AMFAC answers this question. If you all, if the Court were to agree with our interpretation of AMFAC, that that's the end of it, we can all go home. But instead, it is one aspect or one piece of information that I think informs the reasonableness of the agency's decision to look at the exponent investment of Big Bus Tours Limited and decide that that does not change in any material way the offer that was submitted by Big Bus Tours. I think if I understand your position, and I'm listening to your response to all the questions, the government's position is, if information came to you which sent the balloon up, whether it's mafia, whether it's terrorists, whatever, unsavory people had purchased a controlling interest in the bidding, you have the option to look into it and decide, no, we don't want to touch it with a 10-foot pole. And we won't recognize the clarification in this case. It won't be sufficient to get by our screen. But you don't have an obligation to look beyond a notification that there is a change in relationship, whether you call it relationship as Judge Tatel did or whether you call it control, you don't have an obligation to look beyond the information that you've got in this case or in any case where there's just information that somebody has purchased 60% of a parent. Isn't that basically your position? You can if you want to, but you're not obliged. That sort of responds a bit to Judge Wilkins' position, isn't it? Isn't that basically your position? You can, but you don't have to. Yes, Your Honor, with one caveat, which is if there is something, as you said at the outset, if something raises a balloon, but yes, if not, then yes, Your Honor, I think that does. Okay. So let's hear from Mr. Swain. Thank you, Your Honor. Thank you, Your Honor. Good morning. I'm Frank Swain representing City Sightseeing Washington, D.C., doing business as Big Bus Tourists. It is the company that was awarded the concession and continues to operate it today. I'd like to actually follow up on the colloquy that you were having with the government attorney on the issue of what would happen if a bad actor from wherever was thought to be involved. I want to remind the Court that Big Bus Tourists, as did each of the other bidders, had to, under the rules of the solicitation, have a cover letter in which it certifies in the cover letter that there are no individuals or entities acting as an offeror or with an ownership interest in the offeror that have been indicted, debarred, and so on, several certifications. And so it's a relatively wide-open certification. It's the offeror. Does it have to disclose that somebody is a mafioso who's never been indicted? No. No, not if they haven't been indicted. But my point is that this is a continuing certification. So if there is a change after the bid is in, but before the award is made, if there is a change and somebody has gotten in a controlling position or a director or an owner of a controlling company, then it is an affirmative obligation of our client to report that. It is not an affirmative obligation of our client to report the fact of a change that's otherwise benign or doesn't involve debarred individuals or indicted individuals. It is in the discretion of the agency if they become aware of that information from whatever, from reading it in the newspaper, to make inquiries. And I'm not aware of any limitation on the level of inquiry that the agency can make. The agency can also decide not to make any inquiries. Well, no, wait a minute. If they allow you to make an amendment, then you have a problem, right? If it's an amendment. But we don't believe that if the agency is soliciting information, that that falls in the nature of a clarification. Mr. Gordon seems to think that if the agency simply comes into the agency's possession of new information, it can't ask the bidder for any response to that. Its only choice is to disbar the bidder. We obviously disagree with that reading. It flies in the face of the ability of the agency, which is recognized in the rule, to ask for a clarification. But the clarification, according to the rule here, can only ask for something that stems from an ambiguity in the bid. There was no ambiguity. There was nothing ambiguous in your bid. As you can see, your bid was totally accurate. I'm sorry, Your Honor. Go ahead. There certainly was no ambiguity at the time the bid was submitted. Subsequent events created an ambiguity through no fault of any of the parties. Then the agency is, in our position, not only allowed to, but it would be good judgment to ask the question. In fact, in other cases about clarification under the FAR, and I know the FAR doesn't control here, but the agency has the discretion. I'm just looking at the language. It says, clarification refers to making clear any ambiguities that may have been contained in a proposal, have been contained.  True, they became, there was a, they subsequently became, they raised a question, and your answer, your company's response was, hey, nothing's changed, right? That's right, Your Honor. So, well, I don't see how, I mean, it seems to be a real, yeah, go ahead. Isn't it fair to say that if you look at the regulations, what the agency wanted in response, the response they wanted to the question really doesn't clearly fall in either an amendment or a clarification. That's right. Because the term amendment has competitive consequences. Right. As I read the regulation, that you can't have an amendment that would prejudice the other bidders, which implies something to do with the substance of the bid. So this is really something that doesn't, on its face, seem to fall within either the amendment or a clarification. I would agree, Your Honor, and that's a key point. Typically, an amendment is deemed a change in the proposal. We're going to buy more buses. We're going to run different sets of routes, whatever. So what the, and if you look at the. . . Because then it reopens it to the other bidders. Yes. If you look at the proposal as a whole, it really, if you think of it as having, you're making a proposal, I know this is a government contract, but any proposal has what are we going to do for you, and by the way, here's our resume. The what are we going to do for you isn't changing at all in this situation. Arguably, something about the resume is changing. The government has discretion to ask about the resume because it doesn't change anything about the proposal. Suppose this is neither a clarification nor an amendment. Then what? I think it should be. Then there's nothing that, in your view, then nothing bars the agency from asking for the information anyway. If the agency is asking for additional information on this point of specific. . . But they call it a clarification. Does that mean the whole thing fails because they hit the wrong button? I think if it's an amendment, it arguably fails, not if it's a clarification. Suppose it's neither. Well, that's why we have courts, I suppose. All right, I appreciate your point. All right. The only other point I'll make, Your Honor, is on the issue of the threshold. I do want to draw the attention of the Court to the fact that I don't completely understand the opponent's argument that they were not aware that the threshold, in their view, should have been higher in triggering congressional notification. Because in the prospectus, the fact that the agency did not intend to report this to the Congress is noted. On the very same page, there is a sentence that says, if you disagree with any fact in this, then you should let us know at the time the bids are received. And about 10 pages later in the prospectus, there is a clear estimate of the receipts, and it is above the $5 million threshold. So the fact may be that the more exact estimate didn't come out until the record came in. But I would suggest, Your Honor, that every bidder was aware that the totality of the revenue, both the required services and the authorized but not required services, might exceed $5 million. Okay. Does it matter? Would the money be any different with respect to the three bidders? Each of the bids had a slightly different estimate as to what proportion of the totality, how that is disaggregated, what proportion is required as opposed to authorized and optional. Your Honor, I'm trying to understand. The amount of revenue that would flow to the bidders, does it change? Yes. The amount of revenue is the ticket sales. I didn't know that. Different bidders had different price for their ticket sales? No. The prices were set in the prospectus. I thought that was true. It didn't matter which company got the bid. The revenue would be the same. The total revenue under the contract for purposes of the threshold, part of the bid was that each of the bidders put in a number that it was going to pay the Park Service as a concession. And that number varied. Our client put in the highest number, and that was one of the factors that merited a high rating that it got. That's what I was trying to get to. Okay, thank you. Thank you, Your Honor. Mr. Garden, I think you were out of time, but you can take two minutes. Thank you. Your Honors, I think we've certainly been through much of this, so I won't go over old ground, but I did have one comment with regard to AMFAC with regard to repercussions in the situation that people like my client would face. The problem that I'm seeing is that if AMFAC, the dicta statement, can be used as a basis to find the agency was reasonable, the problem that concession would face is that AMFAC effectively becomes the binding precedent in the sense that you can't overrule it because it was dicta, but yet the agency can rely upon it as the basis for conducting itself reasonably, regardless of the language of the regulation. Yeah, I think that's exactly the issue. Okay, thank you, Your Honor. No, that's why we asked about it, but it doesn't really resolve it for us. But could you just tell us what's your reaction to what Mr. Swain just said about the fact that the prospectus itself warned that any objections to failure to notify was right and that the total estimate was over $5 million, which made clear that some of these revenues were from non-requirements.  As I mentioned, I think that the situation we had, we weren't aware of the actual facts. No, but they're right there in the prospectus. That's his point. His point is that the prospectus put everybody on notice not only that you had to challenge this, but also that the amount of money was over $5 million. What more did you need? And in fact, that's why you put it in your complaint, right? Well, Your Honor, this is what happened. They said the prior money was $8.1 million estimated revenues historically, but they said there's going to be changes under this new contract, so we're estimating the new revenues are going to be far less, below $5 million. What we found out later was they actually estimated that the reduction would be 10%. That doesn't take you below 5%. But the problem we were faced with is the prospectus says here is the statute. Here's the agency's estimate. And they say specifically go find your own number, but this is our estimate. You don't rely upon it. So we would only have a basis, but we would only have all the facts we needed to potentially prevail if we knew that the agency's estimate was clearly contrary to what they already knew. But was your estimate in your prospectus for required services in excess of $5 million? Yes, it was, Your Honor. Our estimate differed from theirs. That doesn't necessarily mean theirs is unreasonable. Reasonable people can disagree. When we found out that they actually, unknowing to anybody, secretly had two different estimates, one which was far less and one which was far more. But even their estimate of required services was less than $5 million, wasn't it? No, one of them was. The $7.5 million estimate was for required services. So they had two different estimates for the exact same value, which we didn't know about. That clearly makes it arbitrary. That clearly makes it abuse of discretion. You can't do that. But we didn't have those facts. We just knew that their estimate differed from ours. But we realized we probably should make this point, but we've got a tough road to hoe because they've got discretion. This is an estimate. They said it, and they specifically said it. Go get your own. It wasn't until we saw the administrative record. And we could have. Had we not raised this in our complaint, we certainly could have amended our complaint to reflect this new information and this new allegation. That's not the question. The question is should you have raised it earlier? Yes, Your Honor, we believe we would have. We had enough information to raise it earlier. You did? Yes. That's the government's way to argue. Understood on that particular point. But we do facts in delay afterwards. Okay. Thank you. Case is submitted.
judges: Tatel, Wilkins, Silberman